Case number 19-3094, United States of America v. Russell Davis. Arguments not to exceed 15 minutes per side. Mr. Belli, you may proceed for the appellant. Thank you. May it please the court. My name is Dennis Belli. I represent Russell Davis, who appeals from his conviction and life sentence for distribution of fentanyl resulting in death. This case is a good example of why prosecutors should talk to their witnesses before the indictment stage. And I say that because the indictment in this case alleges that Russell Davis distributed a fatal dosage of fentanyl to the victim, clearly alleges a direct transaction between the two. However, by the time of trial, apparently the prosecutors realized that that was not the case. And they altered their theory of prosecution. And I described this theory of prosecution as being analogous to strict liability in tort, the product's liability principles that apply in civil actions. According to the government, at least in the trial, it was sufficient that Mr. Davis allegedly sold fentanyl to someone. And that was passed on to somebody else who had died. And we would submit that there's no legal authority for that. Why isn't, why isn't the plain text the legal authority for it? Because the way I read the text, all it says is that a death must result from the controlled substance that's identified in 841A. And so where do you get the limit? Your limiting principle seems to be that in order to be liable under the death results enhancement, you have to have delivered the drug personally to the individual who died. But I'm having a hard time seeing where that comes from the language of the sentencing enhancement. And so I'm wondering if you could articulate your theory for why B1C and the death results language has this limiting principle on which you're relying. Because we're not proceeding on a blank slate. If this was a case of first impression, that would be an argument that would need to be discussed, but... So are you saying that our precedent is wrong or do you actually have, so do you have, do you have a theory of why your interpretation of Swiney or I don't know how to pronounce the case name, but how your interpretation of that case is consistent with the plain language of the statute? Because after a Swiney was decided and after the parties briefed this case, this court came out with a decision, United States versus Ham, that discussed Swiney in great detail in very similar circumstances to this case. In the Ham case, Mr. Ham was an intermediate distributor of carfentanil. And the facts showed that he distributed a portion of his carfentanil to a young lady who was the individual who then redistributed the carfentanil to one person who died and three jail inmates who suffered, who overdosed on it. So the facts in that case clearly showed that there was not a direct transaction between defendant Ham and the decedent. And what the court said in Ham, relying on Swiney, they basically, Swiney was decided before the Supreme Court ruled that juries, not judges, must decide certain sentencing factors. So what Ham did was clarify how Swiney applies in the jury trial context, post-apprendi, post-alien. And what the court said is that the approach has to be twofold. Number one, is the defendant guilty of the distribution that was made directly to the decedent? So if the defendant did not personally distribute to the decedent, then the Pinkerton co-conspirator liability. The government must show number one, that the person who did the distribution to the decedent was a co-conspirator. And number two, that that distribution was reasonably foreseeable to the defendant and within the course of the conspiracy. But correct me if I'm wrong, are both of those cases, both Swiney and Ham involved conspiracy theories, as I understand the cases, by which I mean either a conspiracy was the basis, was the charge itself 846, or a conspiracy was the basis for finding a substantive violation, but we don't have that here. This is a direct claim of he personally violated 841A1 by himself distributing drugs. So why isn't that a basis to distinguish those cases and just to follow the plain text of the sentencing enhancement? Well, because in Ham, if that was the case, then there would have been no need to discuss a co-conspirator liability. The death results enhancement was attached to a substantive count. And if the government could simply proceed on that basis, that all you need is one distribution of drug that at some point down the line causes the death of another person, then the whole conversation, the whole discussion about Swiney would be moot. And that, but, but, so correct me if I'm wrong, wasn't one of the theories for substantive liability, a conspiracy theory in Ham? Yes, yes. And so, and so, but that's not the case here, right? There's only the one direct liability. There wasn't a liability, a Pinkerton type liability that you conspired with them. And so you yourself violated the substantive provision. And that's why the defendant should win because the government cannot establish his liability for the distribution that Mr. Kropp was made to the decedent without relying on a vicarious theory of liability that dealt with the decedent that that's undisputed. So, well, Mr. Belli, I mean, it seems that the facts here fit less, perhaps a conspiracy theory of liability than something more like a constructive delivery by Mr. to the decedent because the decedent and corrupt us, or I'm probably misstating his name they pooled their money and the defendant, I think was aware of the fact that the buyer in front of him was buying for the two people. And so, and so the defendant either, you know, in a constructive sense or in some other legal sense was delivering the drugs, everyone understood he was delivering the drugs to both of them, not one person, which is a different theory than conspirator liability, but it would seem to be one that is a consensus assessment of these facts. Well, how would you answer that? That's the facts that I don't support that there, there are, there are no facts supporting the proposition. If they did Mr. Belli, I mean, if they did, would that be a valid basis for the criminal judgment here? Uh, no, I don't think so. And, um, uh, a few months ago I had prevailed in a, an appeal in state court where the, um, uh, prosecution was making that argument and a state court of appeals said, no, you, you have to show, uh, uh, either the, uh, direct sale or some, uh, uh, accepted theory. And plus the jury here was not instructed on a constructive, uh, a constructive sale to, uh, uh, another individual. And as we cited, uh, uh, the case and, uh, Dunn versus United States, a, uh, court of court of appeals cannot affirm a conviction on a theory that is not presented to the jury, even though the court of appeals feels that, uh, if a proper, a properly instructed jury would find the defendant guilty on the uninstructed theory. So I, I don't think, um, and I, I, I, my understanding of the record is that Mr. Davis only dealt with Mr. Crapless. Um, now, uh, Castro White, the, uh, decedent understood that Crapless was buying drugs from Mr. Davis and other sources, but there's no evidence that Davis understood that. Uh, Mr. Bella, this is, this is judge Gilman. Yes. How do you distinguish United States v. Jeffries, a decision of this court on May the 8th, and I'm quoting one sentence. It says, uh, because death or injury from the use of the substance is inherently foreseeable, there is no need to require the government to prove that they were reasonably foreseeable to the defendant. Okay. Well, uh, Jeffries was a one-on-one, um, transaction. The defendant sold directly to the buyer and Jeffries deals with foreseeability of death. And what the court said is that when one sells, uh, drugs to another person that has the potential of causing death, then there's no need to instruct the jury, uh, about foreseeability. But Jeffries foreseeability is a whole, a whole different matter from Pinkerton foreseeability. And Pinkerton is a Supreme court case. Pinkerton talks about whether one co-conspirator is responsible for, uh, a crime committed by a fellow co-conspirator. So they're totally different types of foreseeability. And that's where things get a little confusing. And Jeffries in the footnotes stated that it was dealing with a different issue than, uh, uh, uh, Ham, which was decided like a month or a month and a half before Jeffries. And I just wrap up with one other, uh, uh, argument with regard to the sufficiency of the evidence. And that's basically we've all been discussing here. Um, with our theory of, um, that the, uh, our argument that the evidence is insufficient rests on three different, um, uh, alternatives. Number one, the jury was never instructed on a theory upon which they could find Mr. Uh, uh, Davis guilty. Number two, the evidence shows that, uh, according to Mr. Karapolis, he was a user. There's no way that a jury could find that he's a co-conspirator. And finally Karapolis testified that he just, he purchased heroin. And then we, we disagree that he purchased it from Davis. And that's a whole other issue there because there was a, uh, another, a woman, another drug dealer that was only a few blocks away from, uh, Mr. Davis, and they easily could have gone there except rather than Mr. Davis, but Karapolis says he bought heroin from, uh, Mr. Davis. And we know that in Mr. Uh, Castro White's bloodstream, there was fentanyl, not, uh, heroin. And we also know that, uh, that, um, Mr, uh, Karapolis and Mr. Castro White, uh, had a portion of, uh, the drugs that, uh, Mr. Karapolis had purchased, but then Mr. Karapolis, uh, uh, passed out. Mr. Uh, Castro White stole $40 from his wallet. And then several hours later, he's found dead. And the only thing in his bloodstream is fentanyl. And under this court's previous decision, and I think it was Atkins, uh, the was legally insufficient evidence to show that, uh, the drugs that the defendant allegedly sold were the same drugs that killed the victim. Thank you. Okay. Thank you, Mr. Belli. You'll have your rebuttal here from Mr. Call. Thank you. Good morning. May it please the court, Matt Call for the government. The evidence proved that Jacob Castro White died from a fentanyl overdose and that the defendant, Russell Red Davis, sold those drugs to Castro White and Harry Karapalapis. Now the defense is trying on appeal to impose an additional requirement that section 841 and this court's precedents don't require, he's trying to ask this court to impose some sort of privity of contract, uh, type of a relationship between the seller and the victim. As judge Murphy seemed to point out in his questioning, that's not supported by the text of 841. The text of 841 simply says, if you've distributed drugs under A1 or delivered drugs, you're guilty of the offense. And the penalty provision B1C says that if death or serious bodily injury results from the use of such substance, then the enhanced penalty, uh, applies in this case. And, and what would you say, uh, Mr. Call to, uh, Mr. Belli's argument that Ham and Sweeney have overlaid the statutory tax with this sort of, uh, either a hand to hand transaction type requirement or that you have to show some sort of conspiratorial liability. I read those exactly the opposite way, your honor. In fact, um, in Ham, the problem was that the distribution was proven through a Pinkerton theory of liability and the jury instructions in Ham imposed the enhanced penalty only as a result of a Pinkerton theory as well. And that was what created the error and required reversal in Ham. And the jury instructions here, there was no Pinkerton theory. The government was only proceeding under a substantive theory of distribution and a substantive, uh, proof that, uh, death resulted from it. And there was never any Pinkerton instruction. It's kind of ironic in their initial brief, they said such an instruction should have been required. Um, and as Ham has come out, as Sweeney, excuse me, as Ham has come out and as Jeffries has come out, this court has made clear that when the government proceeds that way, it can't use Pinkerton liability to get the death results enhancement. Ultimately here, under, under the plain text, does your, does your argument have any type of limiting principle? I can imagine. What if a defendant sells to a person who then gets robbed of the drugs and the robber of that drug drugs and sells to some other person who sells to some other person. Could you charge the first defendant if there's a death at the end of that long chain? Could you charge the first defendant who actually distributed the drugs with the death results enhancement? In your hypo, your honor, I'm not sure that the initial defendant is guilty of an offense. If he's robbed of the drugs, he hasn't. No, no, no, no, no. The defendant, the defendant distributes drugs to a consumer and the consumer is then robbed of the drugs. And then the robber resells them to somebody else and that somebody else dies. So the defendant did distribute the drugs that ultimately led to somebody else's death long down the causal chain. Um, I assume that, uh, is the government's position that as long as you can show a distribution violation and a death somewhere that it's sufficient for the enhancement. Uh, that is what we believe your honor. And we think that's supported by ham, which said that if it, if you can prove that the defendant was in the chain of distribution, uh, that that is sufficient, um, to hold him guilty for the enhancement, assuming of course that we can prove the, uh, a one, uh, eight 41, a one violation. And that makes sense. Really a, um, taking it to a more realistic scenario, a high level supplier shouldn't be able to insulate himself or herself from this enhanced. Penalty merely by putting several intermediaries, uh, in between that. Uh, and, and the, the statutory text doesn't seem to provide any kind of privity of contract type requirement, which is what Mr. Belly is seeming to require. And let's remember we're not only, uh, the standard of review here is plain error. The jury instructions here, uh, Mr. Davis agreed to allow. And in fact, I would point out to this court, they are verbatim. The same instructions that this court a month ago found in the Jeffrey's case were proper. Uh, so we don't think that they're, um, challenged to the jury instructions of the causation instructions, uh, has anywhere to go to court. Can I, can I ask you, I'm switching, switching gears a little bit, if that's okay, um, yes. Can I ask, um, uh, just on harmless error I'm having, uh, on the probable cause and the affidavit issue. Um, I'm, I'm trying to figure out what evidence under the harmless error analysis actually would have been suppressed if, um, uh, if we, if under, under your theory that we should just immediately go to the harmless error analysis, uh, and I'll ask both sides. I saw this up rebuttal too, as I understand, most of the evidence came from other sources. And I was hoping you could clarify that, uh, either the toll records from the telephone companies or text message from, um, Castro White himself from the three days. So as I understood, uh, the, the evidence we're talking about here are the search of the drugs that were found at the home, and then maybe a few of the text messages, uh, one of which was actually quite helpful to the defendant that was a sleep text message, what other, what other evidence, um, would, would have been, um, excluded, um, and, and that should be considered under harmless error analysis, if you wouldn't mind talking about that a bit. Uh, yes, your honor. Um, I think the court has, or your honor, you've accurately stated what it would be. The, uh, text messages from the defendant's own phone, uh, which include the, what the defense says is exculpatory text message was sleep, was something obtained during the search. The evidence that the government relied upon, uh, the most incriminating evidence was all obtained prior to, and obviously independent of, uh, the search of the defendant's residence prior to, uh, searching the defendant's residence, the government had, uh, obtained text messages from Verizon wireless, from the victim, Mr. Castro White's telephone. They had obtained the call detail records. The cell phone location information had located and talked to both Mr. Stock, uh, and Mr. Cara palace. And it was all of that information that led us to, uh, the search of the defendant's home. In the defendant's home, there was no fentanyl found there was marijuana and there was cocaine, which he pled guilty to. Uh, and then we found his cell phone. Now the cell phone certainly was a helpful piece of evidence for us, but it was cumulative. We had already learned from both stock and from Cara palace, uh, the defendant's phone number, which ended in, I believe eight, eight one zero. And we would have been able to prove that because Mr. Cara palace was cooperating with law enforcement, made a controlled and recorded phone call to Mr. Davis on that telephone. Uh, he identified him by voice, uh, detective Sievert identified him by voice. So finding the defendant's telephone, um, was a, an important piece of evidence, but it was cumulative. I didn't you in closing argument, the government said that cell phone was a treasure trove of information. And then you argue that. So how can you say that, uh, was that wasn't a reasonable possibility that the evidence complained of might've contributed to the conviction, which is the standard under United States versus DeSantis our case. It is your honor. It was a treasure trove of information showing that Mr. Davis was a drug dealer, a point that he never contested and continues not to contest. His defense at trial was not that I'm not a drug dealer. I didn't distribute drugs. His defense at trial was I didn't sell these particular drugs that night. And his most important piece of evidence for that was this was sleep text message, which came from that phone. And we wouldn't have, uh, obtained that phone, uh, but for the search warrant, if I could just interrupt for a moment, I believe we lost Murphy. Um, let me, yeah. All right. Let's, let's pause the time for the argument, please. And we'll try to bring judge Murphy back. Uh, Mr. Call, you may proceed. Thank you. I wanted to ask you, Mr. Call, it isn't, does the government concede that the affidavit for the search warrant was insufficient? The affidavit itself on the four corners. Yes, I do. Your honor. We do. Okay. However, so your defense or your answer then is, well, why in that tough luck? Well, because you're saying it's harmless. Is that basically your response? That's one of the two responses. The other response, your honor, is that, uh, the magistrate judge recognized that it was deficient and took additional oral information at the time that he, uh, before issuing the warrant and we proffered that information in our suppression response, it was always our understanding, uh, that judge Boyko would hold a suppression hearing at which we could present that evidence, and then shortly after we filed our response, he went ahead and ruled based on the information that we proffered, uh, in our motion. Uh, the Shields case, uh, from this court says that additional information, if provided under oath, can be used as the basis to, uh, support a search warrant, um, and, and that's what happened here. Uh, both, uh, detective Sievert and magistrate judge Cook, uh, if called, we believe would have testified about additional information that Sievert provided to the magistrate judge before he issued the warrant. Tell me, did he issue a limited remand then for that purpose? There's a case we've got United States v. Beals from 2012 that provides that procedure. Yes, your honor. If the court finds that there's a reasonable possibility, if you don't go with our harmless error argument, we'd ask the court to issue a limited remand for that evidentiary hearing. Um, the trial testimony shows that detective Sievert had that additional information. He testified about it at eight 24 to eight 32. Harry Karapolis testified about that at 1495 to 1496. There was a plethora of additional information. Hera palace specifically identified Mr. Davis. He picked out his house on a Google satellite map or a Google earth image. Uh, then detective Sievert verified that it was Davis's house by, uh, pulling police records regarding Mr. Davis and by verifying his car was at that. So the nexus, which doesn't appear in the four corners of the affidavit, um, was established under oath, uh, before the magistrate judge, before the warrant was issued. And what do you do to, what do you do about a master's or master's case, which suggests that the magistrate didn't even have the authority to issue this one? The master case is puzzling. It's an unreported case from an intermediate Ohio court. And no, I'm talking about, excuse me. I'm talking about our sixth circuit case that suggests the fourth amendment is violated. If an actor, a state actor who doesn't have authority to issue warrants actually issues the warrant. Well, Ohio revised code 29 33.23 says that judges or magistrates in Ohio may issue warrants. And this was a Lorain County, uh, municipal court magistrate. So under Ohio law, the magistrate did have the power in that case. The judge was issuing a warrant completely outside of his jurisdiction and masters, uh, that was a separate independent fourth amendment violation. Uh, here, their claim that the warrant was void from, from the beginning, because it was not signed by a proper person is based on an unreported Ohio case that, that still upheld the, or still did not order suppression because of good faith. Well, I did, I did a fair amount of research. I recognize that magistrate can mean different things and, um, uh, different contexts. And here, I think there's a fair amount of Ohio state case law suggesting that this particular type of magistrate couldn't, um, issue, issue these warrants. I think there's several, um, cases from the courts of appeals, at least that I saw that, uh, suggest that, um, it had to be a court of common, please judge and not a magistrate judge who's connected to the court of common police. I did not see that in Mr. Belly's brief. This was an issue that was raised, never raised below. It was raised for the first time on appeal and Ohio law, Ohio revised code 2933.23 says a judge or magistrate may issue warrants if it is based on probable cause. So, uh, we believe that is, uh, sufficient here. Um, moving on to, um, if there are no more questions on the search issue, I'll briefly state that, uh, the argument that there was some sort of a constructive amendment or variance from the indictment, uh, simply is not, uh, supported here. Uh, again, it's a plain error claim because it wasn't raised below. There was no, uh, amendment or constructive amendment. The defendant was charged with a, uh, a one distribution of fentanyl, and he was convicted of that. And the your own or Citroen case that, uh, Mr. Belly sites for Mr. Davis doesn't require a different result there. The Supreme court found a constructive amendment because the defendant was charged with an extortion scheme involving sand, I believe being imported from Pennsylvania and the government proved an extortion scheme about steel being exported to, I think it was Michigan and Kentucky. I think the fair analogy would have been if the government charged Mr. With, uh, distributing fentanyl, but instead proved he had been, uh, distributing cocaine or methamphetamine. Um, that would be a more fair analogy. Uh, but there was no constructive amendment at most here. There was a variance, but we don't even think there was here. And there certainly was no prejudice that resulted in it. Uh, the indictment States that the defendant distributed fentanyl, uh, and the government proved that he distributed fentanyl, Mr. Belly, uh, harps on two words, the words to individual one, which is only in the penalty provision. Uh, this court stated in ham that for the enhanced penalty provision to apply. We're required to prove that he was in the chain of distribution. Mr. Belly's trying to read an extra word directly that he sold it directly to individual one. That's not in the indictment. And, and, uh, there was no prejudice here because the government made clear all and, and the defendant very well knew that the government always believed that Harry Carapolis, Carapalus was the facilitator of this, uh, drug transaction. Uh, and we believe there was ample evidence from Mr. Carapalus and the phone records to show, um, that Mr. Davis sold the drugs and those drugs caused pastor white staff. Thank you. Thank you for your argument, Mr. Call. We will hear rebuttal from Mr. Belly. All right. Um, the first thing it would be a neat trick if the government could, uh, avoid its burden of proof by simply not asking the courts to, uh, instruct the jury on what the proper burden is. Uh, the government made a similar argument in ham where they were alleging that, uh, um, the, uh, sentencing, uh, enhancement provisions were attached to substantive, uh, distribution counts. And therefore they should not be held liable or have to prove, um, uh, principles of conspiracy liability. At page seven 47 of the opinion, uh, the court stated, no one is alleging that ham and shields actually sold carfentanil to LKW and he was the decedent and the County jail inmates who had overdosed, uh, they are only liable for the distribution to LKW and the inmates as Tracy Myers co-conspirators. And Tracy Myers was the one that actually sold the drugs or gave the drugs to those people. Can I cut you off? Cause I'm just curious about the harmless air question on the affidavit. Um, uh, so I, in closing argument in this case, um, counsel for your client suggested that your client is the luckiest man alive. There's incredible evidence that exonerates him in this case. And the credible evidence comes in two words was sleep. Um, that strikes me as, um, one of the principal things that would be excluded under your request for exclusion. I assume that, um, uh, uh, diligent counsel would want to somehow get that, that text message in. So I'm curious what, um, if you could talk just briefly about the harmlessness question and what you think should have been excluded. If this affidavit was invalid. Well, it would have been the, um, uh, phone, uh, and drugs that were seized from Mr. Davis's, uh, residence. So the phone as judge Gilman pointed out was considered a treasure trove of information. Well, what specifically, I mean, what was on the phone that was, you know, that constituted harmful air? Cause the drugs that were found were no big deal. So what, what information notwithstanding the prosecution's characterization, what specifically was harmful? Um, the government alleged that the contents of the phone showed that Mr. Davis was a, um, uh, drug dealer. Now defense counsel conceded that, but the defense counsel had to go with what they had at the time. They knew that that, uh, evidence was coming in because the judge overruled the motion suppress. They could have adopted a completely different, uh, uh, approach. If nothing from the apartment was admitted, then the government would have been stuck with a guy that just lied, uh, consistently in his dealings with the police, Mr. Karapolis and, um, this, um, uh, you know, attempt to shift, um, uh, his guilt to, uh, uh, Mr. Davis, it would have been a far different case. But, but you would, you would agree though, wouldn't you? If, if we exclude it, it, um, wouldn't it exclude the evidence that, that counsel suggested made your client the luckiest person in the world? I mean, we either, we have to look at it. Um, and I, I just, I fail to see a world where, where diligent counsel would not do everything in counsel's power to get that text message in, because that seemed quite powerful to me that it was, um, contemporaneous evidence suggesting that he was asleep responding to a proposed drug deal. Um, yeah. And, uh, I think the defense counsel would have to decide whether it would be better to, um, forego that, uh, with the knowledge that all this other evidence was being, um, admitted and just focus on the, uh, lack of credibility of the, uh, government's, uh, star witness. So, so I think that's why the burden of proving harmlessness is so important. Unlike plain error, the, this error was preserved and therefore it's the government that has to show there is no reasonable possibility that the, uh, illegally obtained evidence contributed, uh, to the verdict. So I, I, I don't think the government has, uh, uh, met that burden. Um, okay. I'll may just have one final word. Yes, sir. Thank you, uh, judge. Uh, I would ask the court, um, with regard to the sufficiency issue, I've concentrated on this conspiracy angle, but I also would ask the courts to compare this case to United States versus Ewing, where this court reversed, uh, a conviction because the, uh, evidence was failed to show that, uh, chain between the defendants, uh, alleged distribution of drugs and the drugs that were actually found in the victim's bloodstream. Okay. Thank you, Mr. Belli. Uh, that, uh, concludes the argument for this case. And Mr. Belli, uh, I note that you were appointed under the criminal justice act, as I think you have been numerous times in my cases and, and I think probably all of our cases here, I want to thank you for your very thorough and thoughtful representation you have done, uh, as in my experience, you've always done, uh, an admirable job of representing your client and we sincerely appreciate it. Thank you, judge. Case will be submitted. The clerk may call the next case.